UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| V. | ) CR. NO. 1-23-cr-10246-DLC <br> ) |
| SUDIPTA MOHANTY | ) <br> ) <br> ) |

DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE TO ADMIT
CHILD WITNESS'S STATEMENTS UNDER FED. R. EVID. 803(2) AND 807

The accused, Dr. Sudipta Mohanty, hereby submits his opposition to the Government's motion to admit the complainant's statements under Fed. R. Evid. 803(2) and 807 and requests that this Court deny the Government's Motion in Limine (ECF 34).

In prosecuting this case, the Government relies on the uncorroborated statements of a fourteen-year complainant, which were made a month and a half after she allegedly witnessed the man next to her ejaculate to completion in the economy section of a crowded Hawaiian Airlines flight (while this man's fiancée's head rested on his shoulder). The complainant alleged this behavior took place on May 27, 202 and planted the initial seeds of her story on May 28, 2022 when, several hours after the alleged incident, the complainant's grandparents asked the complainant why she had switched seats on the plane. The complainant responded that the man next to her had been touching himself under a blanket. In the following days and weeks, the complainant's story took multiple forms, propagating in detail and sensationalism, and culminating in the unlikely tale now before the Court, which involves ejaculate landing on Dr. Mohanty after vigorous masturbation of a fully exposed hard penis without single passenger or flight personnel, including his own fiancée, observing, hearing, or even suspecting anything even

1

arguably similar.

Now, the Government seeks to introduce multiple, although not all, of the complainant's alleged reports of what she allegedly saw on the plane. However, statements the Government now seeks to introduce in its motion are not evidentiarily admissible under Fed. R. Evid. 803(2) and 807 for the reasons explained in more detail below.

I.   The Complainant's Statements Do Not Qualify as Excited Utterances

   a.   The Statements

   ***1. The complainant's statement to her Grandmother LD on May 27, 2022 "some time" after the alleged incident are not excited utterances.***

During the flight from Honolulu to Hawaii on May 27, 2022, the complainant switched seats to an empty seat nearby. The complainant did not say anything to anyone in her previous row or new row, she did not alert flight personnel, she did not take a video or picture of any alleged behavior, she did not send a text that something had occurred, nor did she make any effort to speak to her grandparents about what she allegedly saw, both of whom were seated only a row ahead of her. After "some time," and after the complainant's grandmother (LD) woke up from slumber. LD noticed that the complainant was not in her seat, became worried, and started to look around. The complainant states this occurred about twenty minutes after she switched seats. The complainant spotted LD looking around and walked over to LD. At that point, the complainant allegedly told LD that she had seen LD looking for her and that she had switched seats because something happened and would tell LD later. LD assumed that the complainant had relocated because the person in front of the complainant had been moving around. LD did not notice anything out of the ordinary about the complainant's demeanor and did not assume based on their conversation that something bad or particularly unusual had happened to LD. LD felt no need to press the conversation or check on the complainant further.

2. ***Complainant's statements to her Grandmother LD on May 27, 2022, at least 4.5 hours after the alleged incident and in response to LD's questions are not excited utterances.***

Approximately 4.5 hours after the complainant claims to have seen the alleged behavior, the plane lands in Boston.[1] At the airport, LD and the complainant waited for DD, the complainant's grandfather, to leave the bathroom. To this point, the complainant had not volunteered any information as to what if anything may have occurred on the flight. Neither LD nor DD have noticed anything odd as to the complainant's demeanor. While waiting by the bathroom, however, LD asked the complainant what had happened on the plane. In response to her grandmother's question, 4.5 hours after the alleged behavior, the complainant responded that the man next to her was touching himself "under the blanket" and so she left. The complainant was not tearful, hyperventilating, or emoting anything other than being "uncomfortable" when LD asked her for clarification. Rather than await a response, LD asked the complainant if the man had been touching his "private parts." The complainant answered "yes" but she did not provide any other details to her grandmother. The complainant's family did not see it fit to report the allegation to the airline at this time, seek help from law enforcement, or seek immediate medical or psychiatric attention for the complainant.

3. ***The complainant's alleged Statements to her mother (DB), at least 5.5-6 hours after the alleged incident are not excited utterances.***

"Within hours after landing," or at least, 5.5-6 hours after the alleged incident then, the complainant allegedly spoke to her mother, DB, about what had allegedly happened on the plane. This conversation took place after the complainant had already spoken to her grandmother, retrieved her belongings at the airport, and driven from Logan in Boston to

---

[1] The complainant alleges that the behavior complained of in this case occurred approximately five hours into the flight. The flight from Boston to Honolulu is approximately 9.5 hours.

3

New Hampshire. During that conversation, the complainant allegedly told her mother that the complainant had switched seats because something inappropriate had happened. According to the Government's motion, the complainant explicitly told her mother she was "ok." The complainant was not alleged to be tearful, hyperventilating, or emoting any distress during this conversation nor did this conversation prompt the complainant's mother to take any action with law enforcement or Hawaiian Airlines.

4. ***Complainant's alleged statements to her brother, from 5.5-6 hours after the flight to "a few days" or "3-5 days" after the alleged incident are not excited utterances.***

While the Government claims in its motion that the complainant spoke to her brother, RB, about the alleged incident on May 28, 2024, in law enforcement's interview with RB taking place one year ago, RB remembers specifically that the conversation with his sister occurred "a few days after getting to Connecticut." The Government agrees that RB will testify that the conversation with his sister took place 3-5 days after the alleged incident. Thus, the statements that the Government now frames as "excited utterances" took place after the complainant had landed in Boston, travelled to New Hampshire, and continued to Connecticut in the days following. In any case, if the Government seeks to move up the complainant's conversation with RB in time to support its trial theory with no corroborative phone records, the statements are nonetheless inadmissible as excited utterances.

During this conversation, the complainant called RB and told him that "something weird" had happened on the flight. The complainant allegedly told her brother that the guy sitting next to her was touching himself. The complainant stated she felt "disgusted and awkward" and switched seats as a result. The complainant did not tell her brother that she had seen the man's penis. However, when her brother explicitly asked her if the man's penis was exposed, she

responded that she had seen "it." The complainant said she was "creeped out" and "very disturbed." RB asked the complainant if she had told their mother and the complainant acknowledged that she had not told her mother the man's penis was "exposed," citing "embarrassment" as the reason for her omission of the new fact suggested by her brother during the conversation. The Government includes in its motion that RB and the complainant also "laughed" about the alleged incident.

> 5. **_Complainant's Alleged Statements to her cousin and LD at Nantucket Cookout 44 days after the alleged incident are not excited utterances._**

On July 10, 2022, at a Nantucket family cookout, the complainant shared a new version of the alleged incident with her cousin (MC). While the complainant's narrative does not appear include the flight passenger ejaculating on himself until an August 2022 version, her conversation with her cousin 44 days after the flight contained new twists and a hybrid of previous "retellings," including that the man began by touching himself under the blanket, the blanket was moving, "the blanket moved, or the man moved it" and the man was exposed. The complainant told her cousin that she sat somewhere else because she "could not get the vision out of her head." MC believed the complainant may have also said that the man's "head was tilted back" when he was exposed, and that the woman seated next to him "may have covered the man back up with the blanket." LD, the complainant's grandmother, overheard part of the conversation between the two girls and inserted herself immediately, noting that this was the first time she had heard the complainant claim this man's penis was exposed. In response to her grandmother's interjection, the complainant now claimed that she was "too embarrassed" to tell her grandmother before---- a curative explanation prompted only by LD's recognition of the complainant's prior omission.

b.  The Statements Proffered by the Government Do Not Qualify as Excited Utterances

None of the statements of the complainant that the Government seeks to introduce qualify as excited utterances under Fed. R. Evid. 803(2). As noted by the Government, a statement is an excited utterance when: (i) the declarant experienced a "startling event or condition;" (ii) the statement was "made while the declarant was under the stress of excitement" caused by the event or condition; and (iii) the statement "related to the startling event or condition." Fed. R. Evid. 803(2).

Focusing on the second prong, the complainant's timing and manner of sharing the alleged event undercuts any arguments that the complainant's statements were made while she was under the stress or excitement caused by the event as defined by jurisprudence shaping Fed. R. Evid. 803(2).  By way of analogy to this case, the Government cites *United States v Jennings;* however, the similarities end with *Jenning's* setting on an aircraft. In *Jennings*, the defendant, an airplane passenger, grabbed the victim's buttocks, his fingers toucher her vagina, he attempted to put a blanket over himself and the complainant, put his hand on her inner thigh, explicitly asked the complainant to join the "mile high club," and told her he had a "thing" for young girls.  In contrast to this case, another passenger witnessed the defendant's conduct in *Jennings* and alerted a flight attendant. The flight attendant ordered the defendant to move seats and thereafter, the complainant got up immediately and sat with her brother, "hysterical" and crying.  When the plane landed, the victim was still crying, she could not "really speak," and was incontrovertibly upset. A passenger witness asked the victim what had happened, and the victim immediately reported that the defendant had touched her butt and between her legs.  The conduct was immediately reported to the airline.  *United States v Jennings*, 496 F. 3d 344 (4th Cir. 2007).

The case at hand stands in stark comparison, demonstrating what an excited utterance is

6

*not*. In this case, the complainant told her grandmother that "something happened" *not* in response to the alleged event, but rather in response to her seeing her grandmother looking around for her during the flight to thoughtfully assuage her grandmother's concerns as to the complainant's whereabouts. No spontaneous reporting of the event slips from the complainant's mouth upon witnessing the alleged event. She was not tearful or distraught and nothing in the complainant's demeanor caused LD to assume anything other than the complainant must have been inconvenienced by passenger fidgeting, In the following 4.5 or so hours since the complainant told her grandmother that "something" happened, the complainant did not spontaneously volunteer anything else.  Instead, approximately 4.5 hours after the alleged incident, the complainant's grandmother asks the complainant what happened, to which the complainant responds that the man next to her had been touching himself under a blanket.  The complainant was not tearful or distraught and it does not appear any family member deemed the situation particularly urgent after speaking to the complainant, observing her demeanor, and listening to her complaint as evidenced by the lack of any report to the airline or law enforcement or request for medical attention.  This is unlike *Jennings*, where the victim could barely speak through tears from a physical assault of her body and sustained her distress from the event through deboarding, where law enforcement became immediately involved due to the heightened nature of the circumstances and the victim's panic.

  The Government also cites cases where a complainant's statement was admitted as an excited utterance because it was the complainant's "first real opportunity to report the incident," citing a 35-year-old Fourth Circuit civil case, *Morgan v Foretich*, 846 F. 2d 941 (4th Cir. 1988).[2]

---

[2] This case cited by the Government has no application here.  In that case, the four-year old victim returned from visitation with the defendant.  The victim's mother was not home for another hour, but when she arrived, the victim was yelling and shrieking excitedly. After some time, the victim settled down sufficiently to talk. In admitting the four-year old's disclosures of sexual abuse, the Court placed weight on the fact that the victim was "was nearly

7

The Government expects its cited justification of the complainant's "first real opportunity to report" to somehow span several statements ranging from the vague "something happened" "at least twenty minutes after the alleged incident, to statements made 4.5 hours to 6 hours and potentially stretching to 3-5 days later per RB's memory.  However, this justification is wholly incongruent with the facts before the Court.  Here, the complainant allegedly recognized the significance of the alleged sexual act by the stranger immediately, hence switching seats to move away from this alleged behavior.  Nonetheless, the complainant did not make any report or otherwise indicate that she observed a startling event at the time.  In fact, upon switching seats, the complainant took out her phone to snap a picture of the flight map for a friend whose Toronto home was displayed without noting, recording, or texting anything about the alleged incident. "Some time" passed, after which the complainant noticed her grandmother, LD (who had been worried about the complainant's diabetes all trip and visually checking on the complainant repeatedly) was looking around the aircraft for the complainant. In response to her grandmother's apparent concern, the complainant went up to her grandmother and told her that she switched seats because "something" happened. LD assumed the passenger in front of the complainant had been moving too much, noting nothing unusual about her granddaughter, and the measured, uneventful conversation was left at that until 4.5 hours later.  This is also a big difference from *United States v. Rivera*, 43 F. 3d 1291 (9th Cir. 1995), cited by the Government where the Court admitted the excited utterances of the victim three one and a half hours after her sexual assault by the defendant because the complainant told her mother **immediately** upon

---

hysterical in the moments immediately preceding most of these statements." In addition, the Court's analysis did not rely on the excited utterance exception.  Instead, it looked at other factors including the fact the complainant was four years old and noted that it was "virtually inconceivable" for a four-year-old to "have either the extensive knowledge of sexual activities or the desire to lie about sexual abuse that would be required to fabricate a story such as the one told by the victim." The Court also pointed out that the victim's story was "corroborated by substantial physical evidence and doctors' testimony." All of these factors, together, lent to the admissibility to the statement.

8

coming home, her actual first opportunity to report to her mother, "Mom, that man raped me" in a crying and semi-hysterical state. The emotions attributed to the complainant preceding and following her alleged "reports" in this case range from discomfort to embarrassment, *not* "hysterical"- the seemingly operative word to describe the victim in both cases cited by the Government on this point, *Morgan* and *Rivera*.

  Moreover, the Government claims in this motion the victim was "re-excited" by her impending flight home to introduce the complainant's alleged statements made over one month after the alleged incident on July 10, 2022- another failing argument. The July 10, 2022 statements are inadmissible as excited utterances as revealed through the Government's own cited cases. For example, the Government cites *United States v. Irizarry-Sisco*, 87 F. 4th 38 (1st Cir. 2023) as an example of a situation in which a complainant was "re-excited" and made an excited utterance deemed admissible. Like *Rivera,* however, *Irizarry-Sisco* provides a helpful contrast to show the Court what an excited utterance in a "re-excitement" circumstance could be, in glaring contrast to the facts here. In *Irizarry-Sisco*, the almost 60-year-old defendant sexually abused the body of an 11-year-old victim on multiple dates, touching her vagina and ejaculating on her in a motel room. About one week after the defendant abused the victim in a motel room, the victim and her sister were together when the victim thought she heard the defendant's car outside. The victim immediately became visibly nervous in direct reaction to the sound. Her eyes grew large, she started fidgeting with her fingers, and looked around everywhere. The victim's sister asked her if the defendant had done anything to her. The victim became very nervous and was crying and the defendant's truck was indeed parked outside of the victim's house at the time she was having this emotional reaction. The victim was extremely anxious that the defendant was there to get her, and subject her to the third, consecutive weekend of abuse. In the context of

her visible alarm and distress, the victim's sister asked the victim if the defendant had done something to her--- forming the basis for the statements admitted as excited utterances, even though they occurred one week after the last assault. The victim cried through the entire conversation. Even so, the Court noted that whether the second prong of 803(2) was satisfied, was a "close call," but upheld the decision to admit the statement, noting the victim's emotional reaction *immediately* upon hearing the defendant's car outside, that the victim was "hysterical" during the conversation, and that there was no "brake in [minor's] excited state during the relevant period." The Court emphasized that all of the statements occurred in the course of a single conversation that directly followed the sound of the defendant's truck.  Undoubtedly, *Irizarry-Sisco* is nothing like the facts before the Court here, which involve the thoughtful statements of the complainant, initially made to calm her worried grandmother, and repeated in some form or another with multiple and extensive breaks in the conversation devoid of the "hysteria" threading the Government's cited cases.  The Government also cited *Napier*, where excited utterances of a child victim were admitted eight weeks after the attack, but neglects to emphasize that the victim in *Napier* was hospitalized for seven weeks before she was able to speak about the attack, undergoing two brain operations. *United States v. Napier*, 518 F. 2d 316 (1975).  Because of her brain trauma, the victim could only communicate in isolated words and phrases, often precipitated by situations of stress and strain.  One week after leaving the hospital, the victim's sister showed the victim an article with a photograph of the defendant. The victim looked at the photo but did not read the article and immediately displayed "great distress and horror and upset" and pointed to the photo, repeating, "he killed me, he killed me." The victim had not discussed the incident with any family member to that point. Again, the facts in *Napier* lend no support to the Government's arguments here.  The complainant's statements are not

excited utterances, do not qualify under any other hearsay exception, and cannot be admitted in the Government's case in chief.

II. The Complainant's Statements Cannot Be Admitted Under the Residual Hearsay Exception

The residual hearsay exception is to be used "very rarely, and only in exceptional circumstances." *United States v. Ellis*, 935 F. 2d 385, 394 (1st Cir. 1991). In reviewing the statements the Government seeks to introduce, there is no circumstantial guarantee of trustworthiness to the complainant's statements. The complainant's statements do not fall under any recognized exception to the hearsay rule, undercutting arguments of trustworthiness since the policy arguments yielding the existing hearsay exceptions are absent here. Additionally, the lack of trustworthiness is highlighted by the utter lack of corroborative evidence, despite the behavior allegedly taking place in a setting replete with witnesses. Every version of events by the complainant is different, each less likely than the next, increasing in untrustworthiness and striking lack of corroboration. Furthermore, if the Court wishes to analogize the "first complaint doctrine" in Massachusetts, as urged by the Government, to support the introduction inadmissible statements, even then, the only statement arguably admitted would be the very first statement to LD about "something" happening- not the long chain of evolving stories offered by the Government to support an otherwise hollow case. *See Commonwealth v King*, 445 Mass. 217, 242-243 (2005). It is no surprise that the Government seeks to introduce the complainant's various out of court statement as evidence in the face of the marked absence of corroborative evidence, particularly given the context in which the behavior allegedly occurred. However, that the complainant repeated the false allegations in various forms in the weeks following the flight does not make the claims truer, rendering evidence of the complainant's repetitions of some event on the flight (albeit of evolving detail) in the Government's case-in-chief not only largely

11

irrelevant, but not admissible under any hearsay exception.  The statements must be excluded.

                Respectfully Submitted,
                Counsel for the defendant,

                */s/ Claudia Lagos*
                Claudia Lagos
                Scully & Lagos
                10 Post Office Square
                Boston, MA  02109
                (617) 307-5055

Dated: January 22, 2024

## Certificate of Service

     I hereby certify that a copy of this Motion was served via ECF to all registered participants identified in the Notice of Electronic Filing (NEF) and paper copies will be served upon any party or counsel of record who is not a registered participant of the Court's ECF System. /s/ *Claudia Lagos*, January 22, 2024