UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| V. | ) CR. NO. 1-23-cr-10246-DLC |
| | ) |
| SUDIPTA MOHANTY | ) |
| | ) |

### DEFENDANT'S MOTION TO DISMISS PURSUANT TO BRADY v. MARYLAND FOR FAILURE TO DISCLOSE INTERVIEWS WITH FLIGHT ATTENDANTS CONDUCTED AT FBI DIRECTION

The Government has accused Dr. Sudipta Mohanty of masturbating, fully exposed, to completion on the main cabin of a Hawaiian Airlines Flight (HA90) with *one* "witness" to this alleged event, the fourteen-year old complainant. The prosecution had a duty to disclose that in the four months following the alleged incident in this case: the FBI requested the identity of flight attendants on the subject flight, the FBI directed investigatory interviews to be conducted of flight attendants who had been working on the May 27, 2022 HA90 flight, and the interviews with flight attendants on HA90 were, in fact, conducted at FBI request. In response to the FBI-directed interviews of percipient witnesses, the FBI received exculpatory information from the airline that it then failed to disclose to Dr. Mohanty, namely that the flight attendants reported seeing nothing, let alone anything consistent or corroborative of the complainant's accusations. Because the Government had a duty to disclose this evidence and failed to do so, Dr. Mohanty now requests this Court dismiss the indictment against Dr. Mohanty under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Id*; *see also*, *United States v. Diabate*, 90 F. Supp. 2d 140 (D. Mass. 2000) (trial court exercised its supervisory powers to dismiss indictments because government violated discovery

1

obligations, defendant was substantially prejudiced by violation, and government's misconduct was not an isolated occurrence).

    I.    Background

1. Dr. Sudipta Mohanty was arrested and charged in this Court on August 10, 2023, over one year after the alleged incident.

2. Defense counsel began requesting discovery from the Government in August 2023. On or about October 24, 2023, defense counsel received the first discovery production.

3. On December 11, 2023, after reviewing the Government's production, defense counsel wrote a letter to the Government requesting, among other things, "<u>any and all interviews by government agents with passengers, airline employees, or other individuals present on or associated with the flight at issue</u>."

4. In response, the Government stated that witness statements were not yet due, nevertheless "the government will provide reports of interviews by government agents with passengers and airline employees by December 22, subject to the protective order."

5. On December 22, 2023, defense counsel received an additional discovery production. This production did not include flight attendant names, interviews with flight attendants, or indications that the FBI had ensured to secure interviews and information from each flight attendant on HA90.

6. On January 7, 2023, defense counsel inquired again of the Government via email whether agents interviewed any flight personnel from the actual flight and asked if the Government had their information. The Government responded, "where [complainant] did not report the incident to any of the flight attendants or see any of them in the area when it happened, agents did not speak to flight attendants on board, and I do not have their information." The

Government's response contradicts information known to agents and betrays discovery and due process obligations.

7. On January 9, 2023, in its 21-day letter, the Government indicated that other than the information provided it was "unaware of any information that tends to cast doubt on the credibility or accuracy of any witness."

8. Throughout the pendency of this case, the Government has said that they do not have the identifying information for the flight attendants on the flight nor did the FBI interview the flight attendants.

9. In response, defense counsel filed a motion for a Fed. R. Crim. P. 17 subpoena requesting information relative to the flight attendants on HA90.  The Court allowed the motion on January 17, 2024.

10. On January 23, 2024, at 10AM, defense counsel emailed the Government repeating that defense counsel had been asking for law enforcement contact with flight attendants, and inquiring whether the Government had the identity of flight attendants.  The Government responded, "I do not have their names."

11. On January 23, 2024, 5:16 PM, defense counsel received the Rule 17 documents including HA certified records indicate that, in fact, <u>the FBI did seek out flight attendant information specifically, and each of the flight attendants were interviewed *at the direction of the FBI*, after which HA reported back to the FBI that no flight attendant had witnessed the alleged event.</u>

12. Specifically, records indicate that on September 1, 2022, FBI Task Force Officer, Sean Nahale, emailed TC, HA Investigator asking to "<u>secure who the flight crew was for the HA 90 flight. More</u> <u>importantly who was working in [the complainant's] row. I'm just doing my due diligence in</u> <u>talking anyone that may have had contact with [complainant] or witnessed her demeanor</u> <u>during the flight</u>."

13. On September 7, 2022, TC, Hawaiian Airlines Invetigator, wrote an email stating that "On September 1, 2022, the FBI requested to interview flight court members aboard HA 90. If you are able to ascertain that they (flight crew members) did not hear anything about it I can close this request with the FBO Task Force Officer. If they did hear/witness something, I request that they be identified and made available for interview. Could I get a status of no knowledge or if aware identification and availability by September 12, 2022."

14. On September 12, 2022, AC, Hawaiian Airlines Safety Analyst, responded stating, "I have the crew list and will contact them as soon as possible."

15. On September 15, 2022, AC, Hawaiian Airlines employee, emailed several Hawaiian Airlines employees, "confirming that crew members were not witness/ aware of this incident that took place." These communications are attached to this motion.

16. In other words, all flight attendants were interviewed explicitly at FBI direction. At least one witness identified by the Government on its witness list (ECF 46), Thomas Brearly, is copied on the emails discussing the FBI's request to interview flight attendants. Despite this, no witness statements of Brearly provided by the Government include his participation in and knowledge of Hawaiian Airlines communications to interview flight attendants at FBI request.

17. The records in their present form do not include FBI's response to HA's interviews conducted at FBI direction or any further follow up on this matter. However, the crew list was affixed to the HA records provided via Rule 17 subpoena.

18. The Rule 17 production also included the general logistics for in-flight service by flight attendants. Significantly, first meal cart service begins precisely at the row where Dr. Mohanty sat (22). The second meal cart service commences only two rows behind Dr. Mohanty, and directly behind where the complainant allegedly moved after witnessing the

alleged behavior (24).   These records also call for "water interludes/pua patrol" *every 30 minutes*, "offer snack from drawer," and trash pick-up.

19. Consistent with protocol, all of the flight attendants that were interviewed at the direction of the FBI would have conducted the above duties, meaning they were repeatedly near Dr. Mohanty at every thirty minutes if not more.  There is no evidence of any deviation from this protocol.

20. Because the Government failed to disclose exculpatory evidence and witnesses, and where trial is fast approaching, Dr. Mohanty has been prejudiced by being unable to marshal witnesses and favorable evidence, to investigate his case, and to present a fulsome defense at trial.

21. The Rule 17 production also included the flight attendant roster, which includes 10 flight attendants.  According to the roster, then, there were FBI directed interviews of up to ten different people about the alleged incident.  Each of these witnesses spoke about what they remembered about the flight.  Each one of these witnesses was alert and tasked with moving up and down the precise area where the alleged criminal conduct is said to have occurred.  What these flight attendants *did not see* is absolutely <u>crucial</u> to Dr. Mohanty's defense and unequivocally exculpatory.

   I.     Legal Framework

Under *Brady v. Maryland* and its progeny, prosecutors have an affirmative obligation to disclose material, exculpatory evidence, whether for substantive or for impeachment purposes. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150. 153 (1972). When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule regardless of whether the Government acted in good faith.  *See Giglio*, 405 U.S. 150 (172); *see also Carriger v. Steward*,

132 F. 3d 463, 479 (9th Cir. 1997) (material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses).

A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the Government; and (3) the suppression must have been prejudicial. *Comstock v. Humphries*, 786 F. 3d 701, 708 (9th Cir. 2015). Evidence is favorable to the accused when it calls the Government's case into doubt, whether through substantive or impeachment evidence. *Id*. The Government suppresses evidence when the evidence is known to it, and it fails to disclose the evidence to the defendant. *Id*. This duty to disclose is affirmative- i.e. the Government need not wait on a "request by the accused." *Id*. Evidence is prejudicial "if it undermines confidence in the outcome of the trial."

Given the significant interests at stake when the Government charges a defendant with a criminal offense, courts "expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery." *United States v. Bernal-Obeso*, 989 F. 2d 331, 334 (9th Cir. 1993). This uncontroversial requirement mandates that the government "turn over to the defense in discovery *all* material information in casting a shadow on a government witness's credibility." The prosecutor also has a duty to learn of "any favorable evidence known to other acting on the government's behalf in this case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

In addition, the Justice Manual at 9-5.001 states that "it is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." Some factors to be considered in determining whether to review potentially discoverable information from another federal agencies

includes whether the agency played an active role in the prosecution, such as interviewing witnesses or participating in targeting discussions. In addition, prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes and are warned to make careful considered efforts in seeking discovery. Here, an FBI agent, the same law enforcement agency tasked with investigating this case, directed interviews of percipient witnesses as to any conduct or lack of criminal conduct on HA90, clearly falling under 9-5.001's directive.

Turning, then, to this Court's local rules, Local Rule 116.8 requires the following: "the attorney for the government shall inform all federal, state, and local law enforcement agencies formally participating in the criminal investigation that resulted in the case of the discovery obligations set forth in these local rules and obtain any information subject to disclosure from each such agency." Local Rule 116.1(a) dictates that unless a defendant waives automatic discovery, the Government must provide all discoverable material and information in the possession, custody, or control of the government and the defendant, the existence of which is known, or by the exercise of due diligence may become known, to the attorneys for those parties. Local Rule 116.2 indicates that exculpatory information includes information that tends to, among other things, cast doubt on defendant's guilt as to any essential element in any count in the indictment or cast doubt on the credibility or accuracy of any evidence that the government anticipates using in its case in chief. To trigger disclosure obligations, evidence need only "tend to call the government's case into doubt." *Milke v. Ryan*, 711 F. 3d 998, 1012 (9th Cir. 2013).

In this case, Government's failure to disclose the fact that flight attendants were interviewed at FBI direction was patent misconduct by the Government. *See Giglio v. United States*, 405 U.S. 150 (1972). Dr. Mohanty has been severely prejudiced by the withholding of the existence of flight attendant interviews conducted at the direction of the FBI, all of which undercut the

Government's theory, in particular when the Government's case rests entirely on the credibility of the Commonwealth's sole percipient witness, the fourteen-year-old complainant,  In investigating these serious allegations, an FBI Task Force Officer, Sean Nahale, specifically requested the identity of FBI agents, directed HA to conduct interviews with the flight attendants, and those interviews were, in fact, conducted by HA at FBI direction. This prompted HA to summarize the result of its various, FBI-directed interviews in response to the FBI inquiry into a couple sentences, generally stating no flight attendant saw any criminal behavior by Dr. Mohanty.  The Government had a duty to disclose this information and did not do so.

In addition, not only did the Government have a duty to disclose the FBI directed interviews pursuant to *Brady*, but also defense counsel specifically asked for "any and all interviews by government agents with passengers, airline employees, or other individuals present on or associated with the flight at issue." Here, FBI TFO Nahale was in direct communication with HA, requesting flight attendant information, directing that the flight attendants be interviewed, and doing his "due diligence," as the FBI TFO Nahale writes in his email directing this portion of the Government's investigation.  In addition, a witness identified on the Government's witness list for trial, Thomas Brearly, is copied on the emails discussing the September 2022 FBI request to interview flight attendant witnesses. Discovery also reflects that SA Costello, the Government's primary law enforcement witness, had multiple meetings with Mr. Brearly. Nonetheless, the information regarding flight attendant interviews and observations has been revealed for the first time, four days prior to trial, through defense counsel's subpoena rather than government productions.  The content of each flight attendant interview is directly pertinent to this case and, by receipt of this information, defense counsel is now aware of up to 12-13, additional exculpatory witnesses, comprised of ten flight attendants,  FBI TFO Nahale who directed the interviews, and the Hawaiian Airlines employees who ostensibly  conducted the interviews of flight attendants.

8

Dr. Mohanty is profoundly prejudiced through the deprivation of this information at this juncture and his ability to interview, subpoena, and call essential defense witnesses has been irremediably impeded by the Government's misconduct. For the Government to minimize the significance of this information because of flight attendants' lack of observations about the alleged crime would miss the point.  Dr. Mohanty has incurred tremendous loss because of this prosecution for a crime he has told law enforcement from the get-go that he did not commit. These vital witnesses did not see anything not because they were not looking, but because Dr. Mohanty never committed the acts alleged by the Government.  Now, HA records have exposed that:

- Up to ten of the most central percipient witnesses *were* interviewed at the explicit direction of the FBI about the alleged incident in this case only four months after the date of the alleged offense (September 2022);
- The results of law enforcement's investigatory interviews of the flight attendants were exculpatory,
- The Government did not produce this discovery either through its discovery obligations or defense counsel's specific requests.

There is no justification for the discovery violations and Dr. Mohanty's case must be dismissed.

        Respectfully submitted,
        SUDIPTA MOHANTY
        By his attorney

        */s/ Claudia Lagos*
        Claudia Lagos
        B.B.O. #681504
        Scully & Lagos
        10 Post Office Square
        Boston, MA  02109
        Tel: 617-307-5055

January 24, 2024

CERTIFICATE OF SERVICE

      I hereby certify that, on the below date, this document was filed through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Claudia Lagos

Claudia Lagos
B.B.O. #681504
Scully & Lagos
10 Post Office Square
Boston, MA  02109
Tel: 617-307-5055

January 24, 2024